JUDGE MARRERO      10 CIV 5483

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

FRESH HARVEST RIVER LLC,          :

                    :    Civil Action No.

          Plaintiff,       :

                    :

       -against-        :    **COMPLAINT WITH JURY DEMAND**

FIRST COMMONWEALTH BANK,    :
KERRY INC. and THE KERRY GROUP LLC,  :

          Defendants.    :    JUL 2 0 2010

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    U.S.D.C. S.D. N.Y. CASHIERS

      Plaintiff Fresh Harvest River LLC ("FHR" or "Plaintiff"), by its attorneys Storch Amini

& Munves PC, for its complaint against defendants First Commonwealth Bank (the "Bank"), and

Kerry Inc. and The Kerry Group LLC (collectively "Kerry"), respectfully avers as follows:

<u>COMPLAINT</u>

      1.     This case is based on the wrongful collusion between and among the Bank and

Kerry to deprive plaintiff FHR of its right to purchase a state-of-the-art manufacturing plant in

Dubois, Pennsylvania that produces food products for regional and national food and beverage

companies. In sum, after the Bank encouraged FHR to expend millions of dollars in developing

the plant and after Kerry gained access to highly confidential business and trades secret

information while claiming to be interested in dealing with FHR, the Bank and Kerry purported

to finalize a deal between them to wrest the plant from FHR. This action is brought to seek

various declarations affirming FHR's rights to the plant and for damages as a result of

defendants' wrongful conduct.

Parties

2.      FHR is a limited liability company formed under the laws of the state of New Hampshire.  Its headquarters are at 41 Madison Avenue, New York, New York and it operates a manufacturing facility at 2592 Oklahoma-Salem Road, Dubois, Pennsylvania (the "Premises"). Its members reside in the states of New York and New Hampshire.

3.      Upon information and belief, the Bank is a banking organization formed under the laws of the Commonwealth of Pennsylvania.  The Bank has numerous branches throughout Pennsylvania, with a headquarters in Indiana, Pennsylvania.

4.      Upon information and belief, Kerry, Inc. is a supplier of food products with a principal place of business at 100 East Grand Avenue, Beloit, Wisconsin.

5.      Upon information and belief, the Kerry Group, the parent corporation of Kerry, Inc., is a multinational food and flavors manufacturing company organized and existing pursuant to the laws of Ireland and having its principal place of business in County Kerry, Ireland.

Jurisdiction and Venue

6.      This Court has subject matter jurisdiction of this action pursuant to 28 U. S. C. §1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States or a subject of a foreign state.  Fresh Harvest also seeks a declaration of its rights pursuant to 28 U.S.C. § 2201.

7.      This court has personal jurisdiction over the defendants because numerous of the principal acts and events incurred in New York City, including the execution of the primary documents in question and material negotiations. Moreover, Kerry, in connection with its wrongful conduct, committed a tortious act outside of New York which caused harm to FHR in New York.

2

8.      Venue is properly laid in this District pursuant to §1391(a) and (c).

## Background

9.      Upon information and belief, in or about 2007, the Bank, through a foreclosure of security interests on a food manufacturing facility and equipment, delivered as collateral security in connection with a loan issued by the Bank, obtained title for the Premises and certain state of the art food processing equipment (the "Equipment").

10.     In the spring of 2009 the Bank asked FHR, through its chief executive officer and member, Jack Gray, to consult with it and create and develop a plan for the use and ultimate sale of the Premises. The Bank had previous satisfactory business dealings with Gray, who had substantial experience in the food business.

11.     After extensive discussions, Gray and FHR agreed that FHR would reopen the Premises and re-establish manufacturing operations with a view to eventually acquiring it. From the standpoint of the bank, this was highly beneficial as without such intervention by FHR the Premises would have rapidly deteriorated and its value would have been substantially wiped out.

12.     In anticipation of the transaction, FHR entered into a temporary lease of the Premises for the monthly rent of $1, which lease term was extended from time to time, up through and including August 31, 2009 and an Equipment lease, with option to purchase (the Equipment Lease").

13.     During the spring and summer of 2009, the Bank and FHR reached a series of agreements that, through a combination of capital loans, a purchase money mortgage loan and an equipment lease, caused FHR to assume operation of the Premises.

14.     In or about August 2009, the Bank and FHR executed a series of agreements , including:

a.   an agreement of sale pursuant to which FHR would purchase the Premises and the manufacturing equipment at the Premises for $26,000,000.00 ($10,000,000.00 for the Premises and $16,000,000.00 for the Equipment) (the "Agreement of Sale");

b.   a $7,500,000.00 purchase money loan for the acquisition of the building and land on which the Premises is located (the "Loan");

c.   a mortgage on the Premises (the "Mortgage");

d.   an escrow agreement relating to the holding and release of executed documents (collectively, the "Agreements"), and

e.   A short term lease of the premises, which expired by its express terms on or before October 30, 2009 (the "Second Amended Lease") [check name of doc).

The Adjournment of the Closing and the Renegotiation of Terms

15.   As a result of the unforeseen and historic economic downturn in the United States and throughout the world which adversely impacted both the real estate market and consumer food demand, both the Bank and FHR agreed subsequent to August 2009 that the price terms set forth in the Agreement of Sale had been rendered impractical.

16.   As a result, the closing date of the Agreement of Sale was adjourned without date. However, the parties left unmodified, and agreed that final terms had been reached, with respect to the fully executed mortgage on the Premises.

17.   The Bank and FHR agreed in good faith to restructure the terms of the transaction. As the restructuring discussions were ongoing, FHR continued to build the business, something that was not only a substantial benefit to the Bank, but one which the bank actively encouraged.

18.   FHR, which had assumed occupancy and operation of the Premises and Equipment initially under the temporary leases, continued to operate the facility, developing, from scratch, an increasingly successful food manufacturing and processing facility.

19.     In the first year of its operation, FHR has substantially increased the volume of orders as well as the quality and size of its customers.

20.     While FHR was developing the business, and increasing the value of this asset, discussions between the Bank and FHR concerning the restructuring of the transaction were ongoing and included meetings among FHR, the Bank and representatives of potential investors interested in injecting new capital into FHR to facilitate the closing of the entire transaction.

21.     FHR also purchased additional equipment in connection with its operation of the Premises using proceeds of advances under the non-revolving line of credit.

22.     Although FHR failed for some months to make certain payments under the loans (whether delivered or held in escrow) when otherwise due, FHR has since wired funds to cover any arrearages and has requested that any overpayments be credited against future amounts that may become due.  Accordingly, FHR is current on its claimed obligations.

23.     FHR and the Bank continued their discussions concerning the renegotiation of the Agreements, discussing a restructured transaction involving the sale of the Premises and Equipment.

Kerry Develops an Interest in the Premises

24.     As part of its development of the business, FHR began discussions with Kerry, which FHR identified as a potential source of business. Kerry and FHR began discussion concerning FHR becoming a supplier of various food products to Kerry.

25.     In anticipation of and in connection with working with Kerry, on March 5, 2010 Kerry and FHR executed a Mutual Confidential Information Agreement ("MCIA") governing their customer/supplier relationship to protect the confidential and valuable information to be provided to Kerry from misuse.

26.     Under the MCIA Kerry proceeded to repeatedly send its employees and agents, including engineers, to examine the Property, FHR's business and FHR's manufacturing methods. During the course of those visits, extensive information about FHR's business, manufacturing methods and equipment were disclosed to Kerry.

27.     Kerry visited the Premises, interviewed FHR employees and executives, and developed a favorable opinion of the quality of work that the Premises and its employees were capable of producing, was able to view firsthand the state of the art Equipment and obtained access to information not publicly available.

28.     The successful performance of FHR with respect to its prior orders and FHR's impressive operation led Kerry to place orders for products in the range of 8,000,000 cases – a very substantial production level.

29.     Kerry Group was so impressed with the business that FHR had developed that it expressed an interest in purchasing the Premises and Equipment for its own use.

30.     Kerry considered the purchase because it lacked capacity to meet its customers' demand, had recently closed an important manufacturing facility, and was incurring prohibitive transportation costs through the use of other of its facilities. Moreover, the access to the plant had provided Kerry with the opportunity to value the premises and the Equipment. In short, as a result of its unique access to the premises, gained as a purported customer, Kerry learned of the business's true potential and value.

31.     On information and belief, Kerry continues to have problems meeting customer demand from its existing facilities, in particular for a major customer – the nationwide Starbucks coffee chain. Because of the high quality of the Premises and its state-of-the-art Equipment Kerry determined that it could best serve Starbucks and other customer demand by acquiring the

Premises from FHR instead of incurring the expense and lost time of expanding other of its domestic American manufacturing facilities.

32.    On April 8, 2010, Kerry and FHR executed a letter of intent ("April 8th Letter") pursuant to which, subject to further agreement, Kerry would acquire the Premises and Equipment (collectively the "Property") from FHR for $22,000,000. Kerry had an obligation to act in good faith with respect to the April 8th Letter.

33.    In or about April 2010, Fresh Harvest was in a position to fully consummate its renegotiated transaction with the Bank, and could either finalize acquisition of the Property and Equipment from the Bank and sell to Kerry, or it could retain the Property if Kerry reneged or otherwise attempted to renegotiate at a price unacceptable to FHR (as was possible under the April 8th Letter).

34.    Following the execution of April 8th Letter, Kerry, unknown to FHR, contacted the Bank to attempt to acquire the Property.

35.    Upon information and belief, as a result of the back door contact between the Bank and Kerry, the Bank learned of the April 8th Letter and Kerry's interest in acquiring the Property, and Kerry learned of FHR's status as a contract vendee and its rights with respect to the Equipment.

36.    Upon information and belief, Kerry advised the Bank that it was interested in purchasing the Premises and Equipment and would consider a deal directly with the Bank.

37.    The attempt by Kerry to negotiate directly with the Bank violated Kerry's obligation of good faith implicit under the April 8th Letter and the express terms of the MCIA (both drafted by Kerry).

38.     Upon information and belief, as a result of its contact with the Bank, Kerry learned that FHR was in the process of finalizing the terms of its acquisition of the Property and that FHR would be fully capable of performing under the April 8th Letter.

<u>The Bank's Breach of the Agreement of Sale</u>

39.     By letter dated May 6, 2010 (the "May 6th Letter"), the Bank purported to deliver "formal notice" to FHR that the Bank elected to terminate the Agreement of Sale, purportedly based upon, among other things, the fact that the closing did not occur on or before October 30, 2009, notwithstanding the parties' adjournment of the closing without date and ongoing renegotiation of the terms of sale for the Property.

40.     Furthermore, in its May 6th Letter, the Bank asserted that "the Bank has elected to terminate the "lease" of the Premises, effective as of May 31, 2010.

41.     Without explanation, on July 15, 2010, the Bank sent a second termination notice instructing FHR to quit the Premises by July 26, 2010, even though FHR was fully current in connection with any of the arreages incorrectly claimed by the Bank.

42.     However, FHR, after October 30, 2009, was not in occupancy of the Premises under a lease, and whatever leases that were entered into by FHR and the Bank were of a short term nature, with the last of the agreements, expiring by its express terms, on or prior to October 30, 2009.

43.     Fresh Harvest remained in possession of the Premises after October 30, 2009, with the consent of the Bank.

44.     By letter of May 18, 2010 (the "May 18th Letter"), the Bank purported to accelerate its Non-Revolving Line of Credit, based upon its claimed failure to cure the purported default.

45.     On or about May 27, 2010, after it had already initiated negotiations with the Bank to pursue the "back door" negotiation, and upon information and belief that had induced the bank to send the various termination and default notices, Kerry wrote a letter to FHR terminating and revoking its April 8th Letter. Kerry's so-called explanation was pretextual -- it claimed that because the title to the Premises was still in the name of the Bank, it did not need to negotiate the acquisition with FHR.

46.     FHR was concerned that Kerry would disrupt  the Bank's and FHR's consummation of the restructured transaction, and on or about May 28, 2010, FHR wrote to Kerry, warning that they were violating the April 8th Letter.

47.     On information and belief, Kerry disregarded the warning from FHR and accelerated the process of negotiating the acquisition of the Property from the Bank.

48.     When FHR approached the Bank to seek assurance that the Bank was continuing to negotiate in good faith with FHR, the Bank repeatedly assured FHR that its only discussion with Kerry Group had related to narrow technical questions of title to the Premises.

49.     The Bank continued through June to negotiate with FHR while surreptitiously conducting a parallel negotiation with Kerry. The Bank flatly – and falsely as it turned out – denied that it had had any discussions with Kerry Group about selling the Property.

50.     On June 3, 2010  Paul McGrath, an attorney for the Bank, met in New York City with Herbert Feinberg, Jack Gray, Paul Grillo (and their counsel), three members of FHR. Feinberg is also the managing member of a Delaware limited liability company known as Catahama LLC. Catahama LLC became an investor in FHR in March, 2010, and was ready, willing and able to assist in the financing of FHR's acquisition of the Property.

51.    During that meeting Catahama made an offer of $15,000,000 for the Property and Gray and Grillo agreed, as a part of a comprehensive workout with the Bank, to continue to negotiate to resolve certain remaining issues under the credit lines.

52.    Feinberg presented a Letter of Intent from Catahama to the Bank to confirm the details of its predominantly cash offer for the Property.

53.    On June 10, 2010, at the Bank's request, Feinberg flew to Pittsburgh to meet with David Hepler, a senior executive of the Bank and McGrath, accompanied by Jack Gray. Hepler is in charge of workouts for the Bank and was one of the executives who had reached out to Jack Gray of FHR, a year earlier, to ask Gray to help the Bank to dispose of the troubled Property, which was one of the largest troubled loans held by the Bank.

54.    Feinberg and Hepler negotiated further. Feinberg increased Cataham's offer to $16,500,000, and Feinberg was assured -- as he had been at the previous New York meeting by McGrath -- that the Bank wanted to do a deal with FHR and that they were not in any serious negotiations with Kerry.

55.    The Bank stated that it was willing to proceed to close the transaction for the sale of the Property for $16.5 million dollars, and agreed to continue to negotiate the resolution of the issues involving the credit line.

56.    While FHR disagreed with the Bank's correspondence claiming that FHR was in default under various agreements, FHR remitted $575,000.00 to the Bank to cover any and all claimed defaults under whatever agreements the Bank purported to rely.

57.    This tendered amount exceeded the amounts claimed due by the bank (without acceleration); and FHR requested that the Bank apply its overpayments to amounts the Bank may claim due in the future.

The Bank Enters Into an Agreement with Kerry

58.    On or about July 2, 2010, the Bank entered into an agreement to sell the Property to Kerry Group for, on information and belief, a price of $20,000,000.

59.    On information and belief, that agreement calls for the conveyance of title to the Property to defendant Kerry Group on or about July 31, 2010.

60.    The Bank has demanded that FHR quit the premises on July 26, 2010.

FIRST CLAIM FOR RELIEF AGAINST KERRY FOR BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

61.    Repeats and realleges the averments of paragraphs 1 through 60 as if set forth fully herein.

62.    Under the Agreements, the Bank and FHR had discussed a deal under which FHR would acquire the Property for $26,000,000. When the dramatic economic downturn continued through 2009 and into 2010 and other complications arose, the Bank and FHR agreed to restructure those terms.

63.    During the winter and spring of 2010 FHR and the bank continued their restructuring discussions, continued to seek additional capital and simultaneously pursued the possible sale to Kerry and Kerry Group.  In reliance on the good faith of the Bank, FHR continued to develop the Premises and food manufacturing business.

64.    Discussions of the workout were frequent and continuous and included meetings among FHR, the Bank and representatives of potential investors interested in injecting new capital into FHR to facilitate the workout.

65.    The April 8th Letter was drafted by Kerry.

66.    Under the April 8th, Kerry required FHR to refrain, for its duration, from negotiating with any other party for sale of the Property.

11

67.     Under the April 8th Letter, Kerry committed to negotiate in good faith to consummate purchase of the Property.

68.     Kerry was aware that FHR was in the business of the contract manufacturing of foods and food products for sale to many of the same customers as Kerry and in similar markets.

69.     Kerry Group was aware of the strategic value of the Property, which had state-of-the-art facilities and Equipment, and was further aware that FHR, although new to the business, was making inroads into markets which overlapped with theirs.

70.     In the course of its dealings with the Bank, Kerry learned that FHR was in the process of finalizing a workout under which the Property would be fully owned by FHR and that FHR would be fully capable of performing under the April 8th Letter.

71.     By pursuing a direct deal with the Bank and abnegating its April 8th Letter in order to do so, Kerry violated its covenant of good faith and fair dealing in the April 8th letter.

72.     By reason of the foregoing, FHR has suffered damages in an amount to be determined at trial, and, in any event, greater than $75,000.00.

<u>SECOND CLAIM FOR RELIEF AGAINST KERRY FOR BREACH OF THE
CONFIDENTIALITY AGREEMENT</u>

73.     Repeats and realleges the averments of paragraphs 1 through 72 as if set forth fully herein.

74.     On March 5, 2010 Kerry and FHR executed a Mutual Confidential Information Agreement ("MCIA") governing their "customer/supplier relationship."

75.     The MCIA was drafted by Kerry.

76.     Under the MCIA Kerry proceeded to repeatedly send in its employees and agents, including engineers, under the pretext of the customer/supplier relationship, to examine the Property, FHR's business and FHR's manufacturing methods.

77.     During the course of those visits, extensive information about FHR's business, manufacturing methods and equipment were disclosed to Kerry.  Kerry knew that such information was being disclosed solely for the purpose of enabling Kerry to make a determination to purchase product from FHR.

78.     Instead of using the information so obtained solely – as required by the MCIA – for its customer/supplier relationship, Kerry instead used the information to make plans to purchase the Property from the Bank and, when it learned that it could make a separate deal with the Bank, used that information to the detriment of FHR.

79.     By reason of the foregoing, FHR has suffered damages in an amount to be determined at trial, and, in any event, greater than $75,000.00.

THIRD CLAIM FOR RELIEF AGAINST KERRY
FOR TORTIOUS INTERFERENCE WITH CONTRACT

80.     Repeats and realleges the averments of paragraphs 1 through 79 as if set forth fully herein.

81.     Upon information and belief, Kerry knew of the various agreements between the Bank and FHR, the Bank's agreement to sell the Property to FHR and of ongoing discussions to restructure several of the terms of the sale.

82.     Kerry wrongfully, purposefully and tortuously, and without privilege or justification, interfered with FHR's contractual rights and/or prospective relationship by, among other things, wrongfully using confidential information it had obtained under the pretext of doing a transaction with FHR in order to formulate a deal with the Bank and seek to acquire the Property from the Bank.

83.     By reason of the foregoing and as a result of Kerry's tortuous interference which cause damage to FHR in new York, in an amount to be determined at trial, and, in any event, greater than $75,000.00.

FOURTH CLAIM FOR RELIEF AGAINST THE BANK FOR
BREACH OF CONTRACT (SPECIFIC PERFORMANCE)

84.     Repeats and realleges the averments of paragraphs 1 through 83 as if set forth fully herein.

85.     In or about August, 2009, the Bank and FHR entered into the Agreement of Sale, which the parties, as a result of changed economic circumstances, agreed to restructure and close at a later date.

86.     Pursuant to agreement between the parties, the deadline on which the transaction was to close was adjourned, the parties agreed to negotiate in good faith to restructure the terms of sale, and FHR was permitted to continue in occupancy of the Premises and to operate the Facility, which operations were being financed, in part by credit lines previously issued by the Bank.

87.     From the winter of 2009-2010 through June, 2010, the Bank and FHR engaged in ongoing discussions and negotiations for the acquisition of both for a lower price. During that time, with the Bank's knowledge and consent, FHR continued to develop the business and expended enormous resources in doing so.

88.     In or about May 2010 the Bank and FHR had agreed to the resolution of all outstanding issues. The only remaining resolution involved a negotiation between the Bank and guarantors of the credit line.

89.     On May 6, 2010, the Bank purported to terminate the Agreement of Sale, without notice and without providing FHR reasonable time within which to close the transaction.

90.     The Bank's breach of the Agreement of Sale has irreparably harmed FHR.

91.     By reason of the foregoing, the Bank is in breach of its Agreement of Sale, and is entitled to a judgment, granting it specific performance, requiring the Bank to deliver title to the Property to FHR for $16.5 million, negotiate the resolution any outstanding credit line issues, and provide FHR with reasonable notice of a date on which the transaction can be scheduled to close.

FIFTH CLAIM FOR RELIEF
AGAINST THE BANK FOR DECLARATORY JUDGMENT

92.     Repeats and realleges the averments of paragraphs 1 through 91 as if set forth fully herein.

93.     On or about September 1, 2009, the Bank and FHR entered into the Agreement of Sale, pursuant to which FHR would, among other things, purchase the Premises.

94.     The Agreement of Sale provided that the transaction would close on or before October 30, 2009.

95.     In anticipation of the closing, the Bank and FHR entered into a Second Amended Lease, pursuant to which, FHR would remain in possession of the Premises and continue in operation of the facility, with the lease to terminate, by its own terms, on the date of the closing of the transaction or  October 30, 2009, whichever came first.

96.     By agreement of the parties, the closing of the transaction was adjourned without date, and the parties agreed to enter into negotiations to restructure the terms of the sale.

97.     The Bank and FHR did not extend the short term lease.

98.     FHR, with the Bank's consent, remained in possession of the premises as a contract vendee and the parties engaged in ongoing negotiations concerning the restructuring of the price terms of the agreed upon sale.

15

99.     However, the Bank, in its May 6th Letter took the position that FHR was in default in making rental payments under a purported lease., and that the Bank had elected to Terminate the purported lease as of May 31, 2010.

100.    The only leases that ever existed between FHR and the Bank were a series of temporary leases from April 1, 2009 through October 30, 2009 which lease (the so-called Second Amended Lease) by its own terms terminated on October 30, 2009. In fact, the only operative agreement which governed possession of the premises was the Mortgage.

101.    FHR has been occupying the Premises since October 30, 2009, in connection with Loan Agreement and Mortgage it delivered in connection with its agreement to purchase the Premises.

102.    There is in existence no valid lease or other writing under which FHR is obligated to make any rental payments, therefore the March 6th Letter is of no force and effect.

103.    Notwithstanding the invalid lease termination and other baseless default notices also dated May 6, 2010, the Bank and FHR continued their negotiations to restructure the sale of the Premises and the Equipment.

104.    While the Bank has not sought to exercise certain confession of judgment provisions contained in certain of the agreements in connection with certain of the agreements it claims to be in default, any attempt to use those confession provisions would be improper, and, in any event, are oppressive, unenforceable and violate FHR's rights of due process.

105.    By the middle of June, 2010 the Bank and FHR had agreed on a price of $16,500,000 for the Property under a cash offer made by Catahama LLC in behalf of FHR, and further the Bank agreed to resolve the unpaid Credit Lines which related to personal guarantees signed by Paul Grillo and Jack Gray, members of FHR for an additional $2,100,000.

16

106.   Instead of abiding by its agreement, the Bank wrongfully purported to terminate FHR's rights in the Premises and Equipment.  However, not only is the Bank's termination in breach of the restructuring understanding of the parties, but even if the Agreement of Sale were valid and binding, it is improper under Pennsylvania law for lack of proper notice.

107.   In about July 2010, to protect its rights tendered to the Bank $575,000.00 to address any claimed failures to remit amounts the Bank contended to be due and unpaid, regardless of their merit, to protect its rights against the Banks' contended defaults.

108.   The Bank has accepted FHR's tender.

109.   By reason of the foregoing, FHR asks that this Court enter a judgment declaring that:

      a.   The Agreement of Sale, the Loan Agreement and Mortgage is in full force and effect;

      b.   FHR is current on all payments required under the Mortgage;

      c.   there is no "rent" due by FHR for continued occupation and use of the Premises;

      d.   no default has been properly asserted or declared by the Bank under the Mortgage and that any confession of judgment provisions contained in any of the operative documents are unavailable to the Bank;

      e.   the Bank has no right to enter upon or in any way interfere with FHR's peaceful use and enjoyment of the Premises;

      f.   if the Bank is asserting a tenancy under the temporary leases, said leases have been prepaid and would be current even if such leases existed; and

      g.   the purported termination of FHR's rights in the Premises and Equipment is null and void.

SIXTH CLAIM FOR RELEIF AGAINST THE BANK AND KERRY FOR ANNULMENT OF THEIR AGREEMENT FORTHE SALE OF THE PREMISES AND EQUIPMENT

110. Repeats and realleges the averments of paragraphs 1 through 109 as if fully set forth herein.

111. The Bank (in breach of the Bank's agreement to restructure the sale of the Premises and Equipment to FHR under it's the Agreement of Sale), and Kerry (in breach of the MCIA agreement and the April 8 Letter) entered into surreptitious negotiations concerning the sale of the Premises and Equipment to Kerry Group for, on information and belief, a price of $20,000,000.

112. On or about July 2, 2010, the Bank and Kerry entered into an agreement for Kerry's acquisition of the Premises and the Equipment for 20,000,000.

113. On information and belief, that agreement calls for the conveyance of title to the Property to defendant Kerry Group on or about July 31, 2010.

114. Because FHR is a contract vendee under the Agreement of Sale, which continues in force and effect, the Bank lacks legal capacity to convey the Premises to Kerry.

115. Because the Bank and FHR reached an agreement to sell the Property to FHR for $16,500,000 and to resolve the issues of the credit lines, the Bank is in breach of that agreement and a violation of the implied covenant of good faith and fair dealing for the Bank to sell the Property to another party.

116. By reason of the foregoing, FHR asks this Court to enter a judgment declaring that any agreements adversely affecting FHR's rights between and among the Bank, Kerry and Kerry Group are null and void, and to further declare that such agreements violate the terms of the Mortgage.

## SEVENTH CLAIM FOR RELIEF AS AGAINST THE BANK
## TO ENJOIN USE OF "CONFESSION OF JUDGMENT" CLAUSES

116.    The allegations set forth in paragraphs 1 through 115 are repeated and realleged.

117.    Numerous of the Agreements drafted by the Bank contain clauses under which

FHR would be deprived of any rights to assert defenses against actions against it by the Bank.

118.    The Equipment Lease (Para. 19), the General Guaranty and Suretyship Agreement

(securing the Non-Revolving Line of Credit at para. 15), the Revolving Line of Credit

Promissory Note Para. 5), and others, contain identical or similar confession provisions as set

forth in the Mortgage (Para. 6.03), which states:

> Confession of Judgment in Ejectment.  At any time after the occurrence of an
> Event of Default, without further notice, regardless of whether Mortgagee has
> asserted any other right or exercised any other remedy under this Mortgage or any
> of the other Loan Documents, it shall be lawful for any attorney licensed in the
> Commonwealth of Pennsylvania, as attorney for Mortgagor, to file an agreement
> for entering in any competent court an amicable action and judgment in ejectment
> against Mortgagor and all persons claiming under Mortgagor for the recovery by
> Mortgagee of possession of all or any part of the Mortgaged Property, for which
> this Mortgage shall be sufficient warrant.  If for any reason after such action shall
> have commenced, the same shall be stayed or terminated and the possession of the
> Mortgaged Property remain in or be restored to Mortgagor, Mortgagee shall have
> the right upon any subsequent default or defaults to bring one or more amicable
> action or actions as hereinbefore set forth to recover possession of all or any part of
> the Mortgaged Property.

119.    These "confessions of judgment" ("COJ") were inserted into the Agreements at

the demand and through the exercise of unequal, unconscionable and imbalanced bargaining

power, and overreaching by the Bank.

120.    The Bank offered no independent consideration for the COJ clauses.

121.    The COJ clauses further operate to compel FHR -- regardless of how extreme or

unfair may be the conduct of the bank -- to waive other fundamental rights such as the right to a

trial by jury, the right to notice and a timely opportunity to be heard in defense of claims asserted against it.

122.    Notwithstanding that FHR has paid the claimed the disputed arrearages in full and has remitted additional funds to satisfy, in advance by many months, the disputed obligations, as recently as July 15, 2010, the Bank has asserted rights to evict FHR from its Premises, which would destroy its business.

123.    The COJ clauses are oppressive, unfair, coercive, unduly onerous, fundamentally unreasonable and their exercise would constitute a breach of the covenant of good faith and fair dealing as their exercise would deprive FHR of the benefit of its agreement to acquire the Property from the Bank.

124.    If permitted to be exercised, the clauses would operate to frustrate its right to purchase the Property, effect a full forfeiture of its rights and assets without due process and permit Kerry to benefit from its wrongdoing.

125.    By reason of the foregoing, FHR asks the Court to enter a judgment that the "confession of judgment" clauses in the Agreements are null and void and that their exercise would constitute, among other things, a breach of the implied covenant of good faith and fair dealing applicable to the Agreements.

<u>Jury Trial Demand</u>

The plaintiff demands a jury trial on all jury triable counts hereunder.

WHEREFORE, FHR prays for judgment as follows:

   a.   On the first claim for relief, judgment against Kerry in an amount in excess of $75,000, the exact amount to be proved at trial;

   b.   On the second claim for relief, judgment against Kerry in an amount in excess of $75,000, the exact amount to be proved at trial;

c.  On the third claim for relief, judgment against Kerry in an amount to be determined at trial, and, in any event, greater than $75,000.00;

d.  On the fourth claim for relief, judgment against the Bank granting FHR specific performance and requiring the Bank to deliver title to the Property to FHR for $16.5 million, negotiate the resolution any outstanding credit line issues, and provide FHR with reasonable notice of a date on which the transaction can be scheduled to close;

e.  On the fifth cause of action, judgment against the Bank, declaring that:

   i.  The Agreement of Sale, the Loan Agreement and Mortgage is in full force and effect;

   ii.  FHR is current on all payments required under the Mortgage;

   iii.  there is no "rent" due by FHR for continued occupation and use of the Premises;

   iv.  no default has been properly asserted or declared by the Bank under the Agreements and that any confession of judgment provisions contained in any of the operative documents are unavailable to the Bank;

   v.  the Bank has no right to enter upon or in any way interfere with FHR's peaceful use and enjoyment of the Premises;

   vi.  if the Bank is asserting a tenancy under the temporary leases, said leases have been prepaid and would be current even if such leases existed; and

   vii.  the purported termination of FHR's rights in the Premises and Equipment is null and void.

f.  On the sixth cause of action, judgment against the Bank and Kerry, declaring that any agreements adversely affecting FHR's rights between and among the Bank, Kerry and Kerry Group are null and void, and to further declare that such agreements violate FHR's rights and enjoining the closing of any transaction for the sale of the Property by the Bank to Kerry; and

g.  On the seventh cause of action, judgment against the Bank that the "confession of judgment" clauses in the Agreements are null and void and that their exercise would constitute a breach of the implied covenant of good faith and fair dealing applicable to the Agreements; and

h. On all claims for relief, judgment for costs and disbursements and such other and further relief as the Court deems proper.

Dated: New York, New York
July 19, 2010

Yours, etc.,

STORCH AMINI & MUNVES PC

By: _____
Steven G. Storch
Scott Wyner
2 Grand Central Tower, 25th Floor
140 East 45th Street
New York, NY 10017
(212) 490-4100